COMMERCIAL CREDIT CORPORATION v. ASSOCIATES DISCOUNT
CORPORATION, ET AL

5-4791 436 S.W. 2d 809

Opinion Delivered February 10, 1969

*Patten & Brown* for appellant.

*Martin, Dodds, Kidd, Hendricks & Ryan* for appellees.

CONLEY BYRD, Justice. The issue on this appeal is whether a "buyer in the ordinary course of business" of an automobile from a dealer takes title superior to that

of the repossessin lien creditor who had stored the automobile with the dealer.

The record shows that:

1. Cox Brothers Co. Inc., an automobile dealer, on June 21, 1965, sold a 1965 Pontiac to William White.

2. William White, through Cox Brothers, financed the automobile with appellant Commercial Credit Corp., with Cox Brothers being an indorser with recourse. The certificate of title issued by the Motor Vehicle Division of the Revenue Department of the State of Arkansas was issued on July 12, 1965. The certificate of title, properly showing Commercial's lien, was forwarded by the Motor Vehicle Division to Commercial where it has remained until trial of this suit.

3. In March of 1966, William White traded the Pontiac to Cox Brothers in exchange for another automobile. Thereafter Cox Brothers transferred the car to Bobby Reagan, who with Commercial's acquiescence, assumed White's obligation to Commercial.

4. October 14, 1966, Commercial, through its Memphis office and for reasons not shown by the record, took possession of the car from Reagan.

5. Under date of October 16, 1966, the certificate of title in possession of Commercial was endorsed by someone in the Memphis office to show that Commercial's lien on the car had been released.

6. October 20, 1966, Commercial stored the Pontiac with Cox Brothers and returned its file to its Little Rock office. Cox Brothers upon receipt of the automobile executed a storage agreement acknowledging that it had no authority to sell the automobile.

7. From October 10, 1966 to February 28, 1967, Commercial, from an unknown source, received five

monthly payments on the financing agreement held by it.

8. On December 5, 1966 someone forged the names of William White and John Bailey, one of Commercial's agents, to an application to the Motor Vehicle Division for a duplicate title. The Motor Vehicle Division issued the duplicate title, as authorized by Ark. Stat. Ann. § 75-145 (Repl. 1957), and forwarded the same to Cox Brothers in accordance with the directions contained on the application.

9. Under date of December 7, 1966, Commercial's lien, on the duplicate title, was shown as being released through the forgery of the name of John Bailey as an agent of Commercial.

10. During December 1966, Appellee, Associates Discount Corporation came into possession of the duplicate title, in its forged condition, through a floor plan financing arrangement with Cox Brothers.

11. February 16, 1967, Don Chancy and his wife Joy purchased the Pontiac from Cox Brothers by giving a $400 post dated check and financing $2,000 with Associates Discount. The post dated check was picked up March 5, 1967.

12. March 7, 1967, Associates Discount and Commercial discovered that they held duplicate liens on the Pontiac and other vehicles.

13. Associates Discount filed its lien with the Revenue Department on March 29, 1967.

14. Commercial brought this action on May 8, 1967.

15. Mr. George Fell, Jr., Commercial's district manager, assumed that Cox Brothers kept a number of repossessed automobiles on its premises and stated that

Commercial checked vehicles stored by it with Cox at least every 30 days. Commercial's policy was that it preferred that the cars on which Cox was an endorser, be paid for when delivered, but if Cox didn't pay off when the car was delivered, a signed storage agreement was accepted. His testimony with reference to Commercial's practice was as follows:

Q. Mr. Fell, your company actually had physical possession of this car before turning it over to Cox, didn't you?

A. That's right.

Q. Now regardless of what that storage agreement says, you do admit, do you not, that if Cox sold his automobile and gave you this money you would have accepted it, and the only thing you are griping about is the fact that he did not give you the money?

A. As I stated, if Cox had brought the money to pay the account off, I would have accepted it, but I still have the certificate of title.

Q. You wouldn't have turned over the certificate of title until you got the money, but you wouldn't stand in the way of his selling the car?

A. Normally, a man has to check with our office first, but if a man has already sold it, I would have accepted it.

Q. As a matter of fact, wouldn't there be a chance the only way he could get the money, the dealer, is to sell that automobile if he was otherwise broke?

A. He couldn't pay me.

Q. Unless he sold it?

A. Yes Sir.

16.   Mr. Chaney testified that Cox Brothers bought the license for him—that he left the registration of the car up to Cox Brothers.   He had never received title to any car that he purchased and financed until it was paid off.   He understood that Cox Brothers was going to take care of the title details, —that he was relying on them to do so.

17.   John L. Bowen, a new and used car salesman with seven years experience, testified that it was common practice for a dealer to make the filings of title with the Revenue Department as a customer service. Vaughan-Hicks, his employer, employed two women just to handle the certificates.   He also stated that there was nothing unusual about a dealer selling a used automobile prior to receiving the certificate of title.

The trial court found that ''Don Chaney and Joy Chaney purchased said automobile from an authorized dealer and were bona fide purchasers for value,'' and awarded possession of the automobile to Associates. For reversal Commercial relies upon the following points:

I.   That the court erred in finding Don Chaney et ux were purchasers in good faith.

II.   The court erred in finding that Associates was a holder through a purchaser in good faith; and

III.   That Associates is estopped to claim a prior lien by its own neglect and by its failure to perfect its lien prior to acquiring actual knowledge of Commercial's lien.

For affirmance Associates takes the position that Commercial was an "ENTRUSTER" within the meaning of the Uniform Commercial Code, Ark. Stat. Ann. § 85-2-403 (2) and (3) (Add. 1961), and that since it entrusted the repossessed automobile with Cox Brothers, a recognized dealer, the Chaneys are protected as buyers in the ordinary course of business.

Commercial's basic arguments are premised upon the theory that it is a lien holder pursuant to Ark. Stat. Ann. § 75-161 (Repl. 1956); that Cox Brothers was Channeys' agent in securing the title; and that subsections (2) and (3) of Ark. Stat. Ann. § 85-2-403 (Add. 1961) are not applicable to the transactions here involved.

The registration of motor vehicles and issuance of certification of titles thereto are governed by Acts 1949, No. 142 (Ark. Stat. Ann. §§ 75-101 thru 75-191 [Repl. 1957 and Supp. 1967]) as amended. Section 75-149 requires a purchaser or transferee, before operating a vehicle, to obtain the registration within five days and requires the transferee to obtain a new certificate of title. Section 75-150 requires the dealer to execute and acknowledge the assignment of title upon the certificate and to deliver it to the purchaser. Section 75-151 recognizes that the owner's title or interest may pass without a voluntary transfer by operation of law, as in the case of a repossessing lien holder, and recognizes the transfer of a vehicle without the certificates of title upon "... such instruments or documents of authority or certified copies thereof as may be sufficient or required by law to evidence or effect a transfer of title or interest in or to chattels in such case ...."

Section 75-160 in part provides:

"No conditional sale contract, or title retention instrument upon a registered vehicle, other than a lien dependent upon possession, is valid as against the creditors of an owner acquiring a lien

by levy or attachment or subsequent purchasers or encumbrances with or without notice until the requirements of this article [§ 75-160, 75-161] have been complied with.

Section 75-161 provides:

(A) Such filing and issuance of a new certificate of title as provided in this article (75-160, 161) shall constitute constructive notice of liens and encumbrances against the vehicle described therein to creditors of the owner, *to subsequent purchasers and encumbrancers,* except such liens as may be authorized by law dependent upon possession. In the event the documents referred to in Section 62 (75-162) are received and filed in the Central Office of the department within 10 days after the date said documents were executed, the constructive notice shall date from the time of the execution of said documents. Otherwise *constructive notice shall date from the time of receipt and filing of such documents by the department as shown by its endorsement thereon.* (Emphasis supplied.)

(B) The method provided in this article of giving constructive notice of a lien or encumbrance upon a registered vehicle shall be exclusive except as to liens dependent upon possession and any said lien or encumbrance or title retention instrument filed as herein provided and any documents evidencing the same are hereby exempted from the provisions of the law which otherwise require or relate to the recording or filing of instruments creating or evidencing title retention or other liens or encumbrances upon vehicles of a type subject to registration hereunder.

In *House* v. *Hodges,* 227 Ark. 458, 299 S.W. 2d 201 (1957), we held that a certificate of title is not title itself but only evidence of title. In so doing we pointed out that the motor vehicle act only makes it a misde-

meanor for a purchaser not to promptly obtain a title —i.e., the failure to obtain a new certificate of title does not affect a transfer between parties.

Commercial's repossession of the vehicle here in question, of course, was authorized by the Uniform Commercial Code, Ark. Stat. Ann. § 85-9-503 (Add. 1961) and furthermore Commercial was authorized and expected to sell the same at either public or private sale by terms of Ark. Stat. Ann. § 85-9-504 (Add 1961). Thus the trial court could find that, under the state of this record, Commercial was lawfully in possession of the automobile, Ark. Stat. Ann. § 85-9-503, with right to sell the same at private sale, Ark. Stat. Ann. § 85-9-504, without the necessity of a certificate of title, upon "...such instruments or documents of authority or certified copies thereof as may be sufficient or required by law to evidence or effect a transfer of title or interest in or to chattels in such case...."

The Uniform Commercial Code, Ark. Stat. Ann. § 85-2-403 provides in part as follows:

"(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business.

"(3) 'Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless or whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

"(4) The rights of other purchasers of goods and of lien creditors are governed by the Articles on Secured Transactions (Article 9, [§§ 85-9-101-85-9-507]) ...."

Section 85-9-307 provides:

> "(1) A buyer in ordinary course of business ... takes free of a security interest (created by his seller) even though the security interest is perfected and even though the buyer knows of its existence."

Section 85-1-201 (9) provides:

> " 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind ...."

Commercial contends that the terms "entrustment" and "entruster" apply only to inventory financing, and that its rights here as a "lien creditor" were specifically removed from subsections (2) and (3) of § 85-2-403 by subsection (4) which in turn places lien creditors under § 85-9-307. Commercial then contends that the Chaneys cannot take free of its lien under § 85-9-307 (1) because its lien was not created by the Chaneys' seller.

We do not agree with Commercial's theory that its rights as a lien creditor with respect to repossessed property have been removed from subsection (2) and (3) of § 85-2-403. It clearly had possession with the right to transfer title without a certificate of title, and as pointed out by the committee comment, has no right to complain, whether it be considered as a consignor or a lender with a security interest, for the very purpose of placing goods in inventory is to turn them into cash by sale. Therefore, we think that the entrustment of possession is most applicable to a repossessing lien holder with right of sale.

Commercial also contends that the Chaneys made Cox Brothers their agent for purpose of acquiring title

and that the Chaneys are therefore charged with the knowledge that Cox had of the forgeries. The record does not support Commercial's premise on this assertion.

While, as pointed out above, Act 142 of 1949 originally contemplated that the purchaser would be responsible for securing the certificate, it has become apparent in practical application that dealers who assign conditional sales contracts with recourse have a financial interest in seeing that the conditional sales contract is promptly filed and noted on the certificate of title—for instance, In re Shiflet, 240 F. Supp. 183 (Ark. 1965), where the conditional sales contract lien was lost because the purchaser neglected to apply for his title before becoming bankrupt. Therefore when the dealer's interest in prompt filing is considered in connection with the evidence of Cox's conduct in obtaining the registration and certificate of title, we are unable to say that there was no substantial evidence to sustain the trial court's finding on the issue.

Under point two Commercial argues that Cox's knowledge of the defective title should be imputed to Associates since the latter was furnishing Cox the necessary forms, advice, relying upon Cox to acquire credit information and was actually making Cox's sales possible by financing sales. This contention is not supported by the record. The only thing shown by the record is that the Chaneys' financial arrangements with Associates was made on a form furnished by Associates.

Commercial next contends that since Associates did not perfect its lien within ten days after its execution nor before it had actual knowledge of Commercial's claim, Associates is not now in a position to contend that its lien has priority. The record shows that Associates' lien was perfected before suit was filed and under such circumstances its priority must stand or fall upon the validity of the Chaney's purchase. Since we

128

have found that the purchase by Chaneys is protected under the law, we find this contention to be without merit.

It has been suggested that the entrustment doctrine should not be applied to used automobiles because a buyer in the ordinary course of business should know that a certificate of title is outstanding. This was suggested, by way of dictum in *Sterling Acceptance Co. v. Grimes,* 168 A. 2d 600 (Penn. 1961). However, we need not decide the issue at this time because here Commercial fits into one of the few categories under our law where a transfer is authorized without a certificate of title.

Affirmed.