MERCHANTS AND PLANTERS BANK AND TRUST
COMPANY of Arkadelphia, Arkansas *v.* PHOENIX
HOUSING SYSTEMS, INC., et al.

CA 86-250                                                    729 S.W.2d 433

Court of Appeals of Arkansas
Division I
Opinion delivered May 27, 1987
[Rehearing denied July 1, 1987.]

*McMillan, Turner & McCorkle*, for appellant.

*McKenzie, McRae & Vasser*, and *Wright & Chaney, P.A.*, for appellee.

MELVIN MAYFIELD, Judge. Appellant, Merchants and Planters Bank, brings this appeal from the action of the Hempstead County Circuit Court holding that the Bank of Yellville had a security interest, superior to the security interest of appellant, in a modular building still under construction.

Phoenix Housing Systems was an Arkansas corporation which manufactured modular buildings. They were similar to mobile homes except they had no chassis or wheels. The completed buildings were transported by truck and trailer to sites where they were set on a permanent foundation and became a part of the realty. While under construction, each unit was

considered personal property. Appellee Jim Meador was vice-president and chief executive officer of Phoenix Housing from March 1985 until the business was closed in January 1986.

On August 28, 1985, Meador, in his capacity as an officer of Phoenix Housing, negotiated a loan of $90,390.41 with Merchants and Planters Bank. The loan was secured by a security interest in all inventory, accounts receivable, and a specific contract for the sale of Unit 1014. The note was due and payable on September 20, 1985, and was personally guaranteed by Meador. The inventory security agreement provided that as long as Phoenix was not in default on the note, it had the right to sell inventory in the ordinary course of business. However, the agreement also provided that the security interest of the bank would attach to all proceeds (whether represented by cash, checks, drafts, notes, chattel paper, open accounts or otherwise) of all sales or other dispositions of borrower's inventory. On December 18, 1985, appellant filed suit for replevin of the inventory, contending the note was in default.

Meanwhile, on September 16, 1985, the Bank of Yellville had made a loan to Jim Meador and Leigh Ann Meador for $45,000.00 and had taken a security interest in a 1985 fourplex modular home, Serial No. 1019, which was under construction. Meador paid Phoenix Housing $40,000.00 of this money as a down payment on Unit 1019. On September 12, 1985, Phoenix Housing executed a "Manufacturer's Statement or Certificate of Origin To a Modular Home" to the Meadors. However, no further work was done on Unit 1019 and it was tendered to the Meadors several months later in an incomplete condition. It was conceded at trial that in its stage of completion the unit was not equal in value to the Meadors' down payment.

The Bank of Yellville intervened in appellant's suit against Phoenix Housing and Meador individually, contending that its lien on Unit 1019 was superior to the appellant's inventory lien. Trial to the court proceeded as to Unit 1019 only. The court held that the Meadors' purchase of Unit 1019 was in the ordinary course of business and that the lien of the Bank of Yellville had priority over the lien of the appellant.

At trial, Jim Meador testified that he had executed the loan from the Yellville bank in order to purchase Unit 1019 from

Phoenix Housing for a contract price of $80,000.00. He admitted the $40,000.00 down payment was larger than a purchaser would normally make, but testified he did it to infuse funds into the failing company. Meador also said he knew none of the money would be paid to appellant. He testified further that he had been a party to the loan appellant made to Phoenix Housing and was familiar with the financing statement and security agreement. He said he knew that the security agreement covered the inventory of Phoenix, but testified he did not think the sale of that unit would violate the security agreement because of the language in the agreement which allowed the sale of inventory in the ordinary course of business as long as the note was not in default.

On September 12, 1985, when Meador claims to have purchased Unit 1019, the note to appellant was not yet due. Meador admitted that Unit 1019 was never delivered to him and testified that he also knew that under the accounting method utilized by Phoenix Housing a unit was not considered sold until it was completed, delivered, and final payment had been received. He said he also knew that work in progress was carried on the books as an asset of the company and that the books of Phoenix Housing never reflected a sale of Unit 1019 to him. On December 5, 1985, Meador testified, Unit 1019 was again sold, this time to Petromark, and the contract for that sale represented the seller as Phoenix Housing.

Charles White, Phoenix Housing's accountant, testified that according to the procedures used by him in keeping the books, a sale was not reflected on the books until the unit was delivered and, in most cases, the final payment was received. He said at no time was a sale actually recorded on the books until delivery of the unit. White also said that, according to the books of Phoenix Housing, no sale of Unit 1019 had been made. The reason for this was because the unit was unfinished and still located in the manufacturing plant.

■ As its first argument appellant contends the court erred in finding that there was a sale from Phoenix Housing to Jim Meador. Appellant relies on Ark. Stat. Ann. § 85-2-401(2)(Add. 1961) which provides:

> Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes

his performance with reference to the physical delivery of the goods, . . . .

Since there was no delivery in the usual manner, appellant contends there was no sale. Appellees, on the other hand, argue that there was a sale because there was a definite agreement to sell Unit 1019, it was identified to the contract, title was transferred and money changed hands. Appellees insist it was not essential that delivery take place for a sale to have occurred under these circumstances. And they point to the Certificate of Origin which states that Unit 1019 "has been transferred" to the Meadors as evidence that delivery was not necessary to pass title in this case as "it was otherwise explicitly agreed." In discussing the sale of goods to be manufactured, 3 R. Anderson, *Uniform Commercial Code* § 2-501:22 (3d ed. 1983), states:

Title does not pass with identification, as the seller who has not completed his manufacturing of the goods manifestly has not completed his performance "with reference to the physical delivery of the goods," and it is at that time that title passes "*unless otherwise explicitly agreed.*" (Emphasis added.)

■ Although the issue may be close, we cannot say the trial court's finding that title passed to the Meadors at the time the Certificate of Origin was issued is clearly against the preponderance of the evidence.

■ Appellant's second point is that the evidence does not support the court's finding that the sale to the Meadors was made in the ordinary course of business. According to Ark. Stat. Ann. § 85-9-307(1)(Supp. 1985), a buyer in the ordinary course of business takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence. Section 85-1-201(9) defines a buyer in the ordinary course of business as "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind," and section 85-1-201(19) defines good faith as "honesty in fact in the conduct or transaction concerned."

■ White and Summers, *Uniform Commercial Code*, §

25-13 (2d ed. 1980), states that at least five conditions must be met in order for one to qualify as a buyer in the ordinary course of business under section 85-9-307(1): (1) he must be a buyer in the ordinary course; (2) he must not take the goods in total or partial satisfaction of a preexisting debt; (3) he must have bought the goods from one who was in the business of selling goods of that kind; (4) he must buy in good faith and without knowledge that the purchase was in violation of another's security interest; and (5) the competing security interest must be one created by his seller.

Two cases citing these conditions from the White and Summers Hornbook are informative. *Ex parte General Motors Acceptance Corp.*, 425 So. 2d 464 (Ala. 1983), held that a bank which had financed the purchase of a car from a used car dealer held a lien that was superior to the lien of the dealer's financing company. The court said that section 9-307(1) of the Commercial Code allows a "buyer in the ordinary course of business" to take goods held for sale free of a security interest created by his seller because it is felt that such a buyer has the right to expect that a merchant has the power to sell the goods free of such a security interest, and creditors who know that goods financed by them are inventory must expect the goods will be sold and that buyers in the ordinary course of business will take the goods free of liens. On the other hand, in *ITT Industrial Credit Co. v. H & K Machine Service Co., Inc.*, 525 F.Supp. 170 (E.D. Mo. 1981), ITT made a loan to a manufacturing company and took a security agreement on various items of equipment owned by the company. One of those items was later sold to H & K Machine Service Company for its original purchase price and H & K gave the company credit for that amount on its indebtedness to H & K. In holding that H & K did not take the piece of equipment free of the security interest of ITT, the court said H & K was not a buyer in the ordinary course of business because the equipment purchased was not inventory, it was not sold at a profit, and H & K took it as partial cancellation of a preexisting debt.

In the present case, we do not think the evidence previously set out, which is really not in dispute, will support a finding that Jim Meador was a buyer in the ordinary course of business when he purchased Unit 1019. Without restating the evidence, it is enough to say that the amount of Meador's down payment was

larger than usual; the Manufacturer's Certificate of Origin was given to Meador before the unit was completed and before the purchase price was fully paid, both of which were not according to the usual way the matters were handled; after the sale to Meador, Phoenix agreed to refund Meador's money and sell the unit to Petromark, and there is no evidence that such agreement was a usual way of operating; and there was a relationship between Phoenix and Meador which was not the usual customer relationship.

By this last statement we do not mean to suggest that Meador could not make a purchase from Phoenix in the ordinary course of business. The case of *Crystal State Bank* v. *Columbia Heights State Bank*, 203 N.W.2d 389 (Minn. 1973), cited by the appellees, found such a sale where the president and principal shareholder of an automobile dealership purchased a car from his own company. However, that opinion states the sale "resembled in every material way a sale out of inventory to any retail customer." The sale to Meador, simply put, was not such a sale. Meador handled the loan from the appellant bank to Phoenix and was familiar with its details. He was personally liable on the note. He admitted that his large down payment on Unit 1019 was an attempt to infuse capital into Phoenix, and that he knew none of it would be paid to appellant. Obviously, it was to his interest to keep Phoenix operating as long as feasible in order to pay the appellant's note for which Meador was liable. Actually, in this case, regardless of which bank wins, Meador gets his obligation to that bank reduced. We believe that Meador's purchase falls short of the Commercial Code's concept of a "buyer in the ordinary course of business." We think the trial court's finding that he was such a buyer is clearly contrary to the preponderance of the evidence.

Reversed and remanded for proceedings in keeping with this opinion.

CRACRAFT and COULSON, JJ., agree.