

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-16-124

| | |
|---|---|
| FORD MOTOR CREDIT COMPANY, LLC, f/k/a FORD MOTOR CREDIT COMPANY<br><br>APPELLANT<br><br>V.<br><br>FIRST NATIONAL BANK OF CROSSETT<br><br>APPELLEE | **Opinion Delivered** September 14, 2016<br><br>APPEAL FROM THE ASHLEY COUNTY CIRCUIT COURT [NO. CV-2015-138-4]<br><br>HONORABLE DON GLOVER, JUDGE<br><br>AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

## CLIFF HOOFMAN, Judge

Appellant Ford Motor Credit Company, LLC, f/k/a Ford Motor Credit Company (FMCC) appeals from the circuit court's order granting summary judgment in favor of appellee First National Bank of Crossett (FNBC) in FNBC's suit for declaratory judgment. On appeal, FMCC argues that the circuit court erred by (1) granting summary judgment to FNBC and (2) denying its cross-motion for summary judgment. We reverse and remand the order granting summary judgment in favor of FNBC and affirm the denial of FMCC's countermotion for summary judgment. On July 16, 2015, FNBC filed a declaratory-judgment action against FMCC, seeking to have the circuit court declare that it (FNBC) held prior, perfected liens on two vehicles that were owned by Crossett Ford Lincoln, LLC (Crossett Ford). According to the facts alleged in the complaint, FNBC had a history of providing new and used motor-vehicle-inventory financing for Crossett Ford. Floor-plan

SLIP OPINION

agreements signed on August 5, 2010, and on January 28, 2011, gave FNBC a security interest in Crossett Ford's new and used vehicle inventory during the time period relevant to this case. The agreements were signed by James (Jimmy) Murphy, the owner of the dealership, as well as by several other joint obligors.

In July 2012, Crossett Ford purchased a new 2012 Ford F-150 truck (F-150) from Ford Motor Company. FNBC financed the purchase price of the F-150 by advancing $34,072.98 to Crossett Ford on August 2, 2012. In accordance with the terms of the floor-plan agreement, FNBC retained the certificate of origin (COO) for the vehicle, which was issued in the name of Crossett Ford and identified FNBC as the source of financing. The agreement provided that when Crossett Ford sold a vehicle from its inventory and FNBC was repaid the amount it had advanced for the vehicle, FNBC would then release the COO or certificate of title to the dealer. FNBC alleged that it had perfected its interest in the new and used vehicle inventory, including the F-150, by filing financing statements with the Arkansas Secretary of State's office on August 6, 2010, and March 11, 2011.

On August 20, 2012, Murphy executed a Tennessee vehicle retail installment contract to purchase the F-150 from Crossett Ford. The contract was then assigned to FMCC, with Murphy signing his name as the buyer and signing on behalf of Crossett Ford as the seller and assignor. That same day, on August 20, 2012, FMCC filed a direct lien on the F-150 with the Arkansas Department of Finance and Administration (DFA) that listed Murphy as the owner of the vehicle. Crossett Ford did not remit the funds received for the F-150 to FNBC, and FNBC remained in possession of the COO. FNBC thus alleged that it had a

prior, perfected security interest in the F-150 and that FMCC's direct lien was invalid due to the "fraudulent conduct" of Murphy in attempting to sell the vehicle to himself and granting FMCC a lien without paying off FNBC. FNBC further alleged that FMCC was on notice of its prior lien based on the financing statements it had filed with the secretary of state.

The second vehicle for which FNBC requested declaratory judgment was a 2012 Ford Expedition (Expedition). This vehicle was traded to Crossett Ford on August 28, 2014, by Bobby and Stephanie Knight. FNBC advanced the funds to Crossett Ford to pay off the Knight's remaining vehicle loan with State Farm Bank in the amount of $38,747.85, and a cashier's check dated September 24, 2014, was sent by Crossett Ford to State Farm Bank. The Expedition's title was then sent to FNBC. On September 23, 2014, Murphy executed a Tennessee vehicle retail installment contract with Crossett Ford to purchase the Expedition, and the contract was again assigned to FMCC. FMCC filed a direct lien on the Expedition with the DFA on September 23, 2014.

In March 2015, Crossett Ford defaulted on its inventory loan with FNBC, and FNBC repossessed all of the vehicles at the dealership, including the F-150 and the Expedition. FNBC applied for and received a repossession title on the Expedition from the DFA on May 13, 2015. There were no other liens or encumbrances reflected on this title. FNBC alleged that its certificate of title on the Expedition should be declared free and clear of any lien claimed by FMCC.

In its answer, FMCC denied the allegations and asserted that FNBC's security interest

in the F-150 and the Expedition had been released following the disposition of the collateral pursuant to the floor-plan agreements and the Uniform Commercial Code. FMCC claimed that the repossession title on the Expedition was issued in error and that the DFA should be made a party to the suit. FMCC prayed that the circuit court enter an order confirming that it held a first-priority purchase-money security interest in the F-150 and in the proceeds of the Expedition, which FNBC had sold following its repossession.

On September 4, 2015, FNBC filed a motion for summary judgment, claiming that there were no material facts in dispute and that it was entitled to its request for a declaratory judgment. In support of its motion, FNBC attached an affidavit by Gary Brannon, its chief lending officer, who stated that FNBC had held a perfected, first security interest in the F-150 since August 2, 2012, when it had advanced the funds to Crossett Ford to purchase the vehicle and received the COO reflecting it as the source of financing. Brannon asserted that Crossett Ford currently owed FNBC $366,397.57 on its new-vehicle floor-plan debt and that it had a first lien on the F-150 as security for that debt. Brannon further stated that FNBC had clear title to the Expedition when it was sold to a third party on May 30, 2015, based on the repossession title that was issued to FNBC on May 13, 2015. According to Brannon, Crossett Ford owed FNBC a balance of $701,442.94 at the time of the sale, which was secured by its perfected, first lien on the Expedition. Attached as exhibits to Brannon's affidavit were the floor-plan agreements, the financing statements filed with the secretary of state, the COO for the F-150, the original title and the repossession title on the Expedition, and the loan transaction history and cashier's check showing the money it had advanced for

SLIP OPINION

Crossett Ford to purchase both vehicles.

FNBC claimed that Murphy never had title to either the F-150 or the Expedition when he attempted to "fraudulently grant [FMCC] a lien on those vehicles" and that FMCC did not acquire any better title than Murphy had. In addition, FNBC asserted that FMCC could not stand in the shoes of Murphy as a "buyer in the ordinary course of business" because Murphy, from whom FMCC had obtained its lien, was not a person in the business of selling goods of that kind; because FMCC never had possession of either vehicle; and because FMCC could not establish that it took the lien without knowledge that the sale violated the rights of another person in the vehicles.

On September 24, 2015, FMCC filed a response to the summary-judgment motion and a countermotion for summary judgment. FMCC claimed that FNBC's inventory liens in the F-150 and Expedition had been released when the vehicles were sold to Murphy. FMCC attached the August 20, 2012 retail installment contract for the sale of the F-150 that was subsequently assigned to FMCC by Crossett Ford. This contract reflected that Murphy had traded in a 2008 Lincoln to Crossett Ford and had financed the remaining purchase price of $34,072.98, plus interest, over sixty months. The contract and dealer documents indicated that the F-150 had been purchased for Murphy's personal use. FMCC also attached a copy of the electronic funds detail report showing that it had deposited the balance of the contract into Crossett Ford's bank account at FNBC in exchange for the assignment of the contract. FMCC claimed that it had obtained a purchase-money security interest in the F-150 and had perfected its interest by filing a direct lien with the DFA on August 20, 2012. A copy of this

SLIP OPINION

lien was attached to the response.

FMCC also attached a copy of the September 23, 2014 retail-installment contract for the Expedition. This contract reflected that the purchase price of $37,000, plus interest, was to be paid over a period of forty-eight months and that the vehicle had been purchased for Murphy's personal use. Crossett Ford assigned the contract to FMCC, which deposited the contract balance into Crossett Ford's account at FNBC via an electronic funds transfer. FMCC attached a copy of this electronic-funds-transfer report. FMCC claimed that it took a purchase-money security interest in the Expedition at the time of the assignment and that it perfected this interest by filing a lien with the DFA on September 23, 2014. A copy of this lien was attached to the countermotion.

In addition, FMCC attached the affidavit of Murphy, who stated that he had purchased the F-150 to use as a "shop truck" and that it was not marketed for sale on the lot of Crossett Ford. Murphy indicated that he had made approximately thirty of the sixty monthly installment payments on this vehicle to FMCC at the time he declared bankruptcy in 2015. With regard to the Expedition, Murphy stated that it had been purchased for his wife's personal use, although she did not drive it, and it remained on the lot. He indicated that he had made approximately five monthly payments on this vehicle prior to his bankruptcy filing. Murphy further attested that he had purchased a 2014 Ford Explorer in April 2014 for his daughter and that the floor-plan lien on this vehicle was paid in full. He stated that FNBC was aware of this transaction and had not offered any objection. According to Murphy, the floor-plan agreements, as well as the course of his dealing with

FNBC, authorized him to sell vehicles free and clear of FNBC's security interest in the regular course of his business, without prior approval by FNBC. He stated that the transactions at issue were the same as any other transaction between Crossett Ford and a retail customer. Murphy further indicated that FMCC had no knowledge that FNBC's floor-plan liens on the F-150 and Expedition were not paid in full. He stated that FNBC performed monthly floor-plan audits, that each time there were multiple vehicles missing, and that this was considered to be the "norm." Finally, Murphy asserted that in March 2015, when FNBC seized Crossett Ford's inventory and equipment, it also seized its bank account at FNBC where the proceeds of the sales of the F-150 and Expedition had been deposited.

FMCC claimed that it was entitled to summary judgment because its lien on the F-150 and the proceeds of the Expedition were superior and prior to the rights of FNBC. FMCC alleged that it was authorized, pursuant to the floor-plan agreements and the established course of dealing between Crossett Ford and FNBC, to sell the vehicles free and clear of FNBC's security interest pursuant to Ark. Code Ann. § 4-9-315 (Repl. 2001). Furthermore, FMCC claimed that it was not necessary that Murphy be a "buyer in the ordinary course" to come within the protection of this code section. Once the vehicles were sold to Murphy, FMCC claimed that they no longer qualified as "inventory" but were instead "goods" and that it properly perfected its liens by filing with the Arkansas Department of Motor Vehicles (DMV). Even if Murphy's purchase of the vehicles was not "authorized" under section 4-9-315, FMCC alternatively claimed that Murphy was a buyer in the ordinary course and that he took the vehicles free of FNBC's security interest under

Ark. Code Ann. § 4-9-320(a).

In its response to FMCC's countermotion for summary judgment, FNBC asserted that Murphy did not purchase the vehicles in question because he did not have the COO or certificate of title to either vehicle and therefore could not register the vehicle with the office of motor vehicles as required under Arkansas law. Because FNBC claimed that Murphy never had legal title to the F-150 or Expedition, it argued that he could not grant FMCC a valid lien on the vehicles.

FMCC filed a reply in which it alleged that Murphy's failure to obtain certificates of title to the vehicles in his name did not affect the sale of the vehicles from Crossett Ford to Murphy. With respect to the repossession title obtained by FNBC for the Expedition, which failed to reflect FMCC's lien on the vehicle, FMCC contended that the issuance of this title by the DMV was in clear error. In support of its argument, FMCC attached an "Arkansas Interactive Title Registration and Lien Report Summary," which reflected that FMCC's lien on the Expedition was created on September 23, 2014, and that Murphy was the debtor. FMCC asserted that FNBC's repossession lien was not created until May 11, 2015, subsequent to its prior lien. FMCC further argued that FNBC had failed to meet proof with proof by failing to address the claims in its countermotion for summary judgment, including the claim that Crossett Ford was authorized to sell the vehicles free and clear of FNBC's inventory lien.

After a hearing held on December 8, 2015, the circuit court entered an order granting FNBC's motion for summary judgment and denying FMCC's countermotion. The court

SLIP OPINION

found that the "undisputed facts establish that James N. Murphy was not a buyer in the ordinary course of business" and that FNBC's liens on the F–150 and Expedition were prior to FMCC's liens. FMCC filed a timely notice of appeal from the circuit court's order.

On appeal, FMCC argues that the circuit court erred when it granted summary judgment to FNBC because material issues of fact remain on the issue of whether Murphy was a buyer in the ordinary course of business. FMCC further contends that the circuit court erred in denying its countermotion for summary judgment.[1]

Summary judgment is to be granted by the trial court only when there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. *McGhee v. Ark. State Bd. Of Collection Agencies*, 368 Ark. 60, 243 S.W.3d 278 (2006). In reviewing a grant of summary judgment, the appellate court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Id.* We view the evidence in the light most favorable to the party against whom the motion for summary judgment was filed and resolve all doubts and inferences against the moving party. *Id.* The purpose of summary judgment is not to try the issues but instead to determine whether there are any issues to be tried. *Po-Boy Land Co., Inc. v. Mullins*, 2011 Ark. App. 381, 384 S.W.3d

---

[1] While the denial of a motion for summary judgment is not ordinarily appealable, such an order is appealable when it is combined with a dismissal on the merits that effectively terminates the proceeding below. *Gammill v. Provident Life & Acc. Ins. Co.*, 346 Ark. 161, 55 S.W.3d 763 (2001) (addressing appeal from denial of motion for summary judgment where same order also granted summary judgment to appellee and dismissed appellant's claims with prejudice).

555. Even where there are cross-motions for summary judgment, the proceeding is not converted into a bench trial; if material issues of fact remain to be decided or it is impossible to determine on appeal whether either party is entitled to judgment as a matter of law, summary judgment should be reversed. *Id.*

We first address FMCC's argument that the circuit court erred in granting summary judgment to FNBC because material issues of fact remain regarding whether Murphy was a buyer in the ordinary course of business. FNBC acknowledges that a buyer in the ordinary course of business takes free of any underlying security interest created by the seller, even if the security interest is perfected and the buyer knows of its existence. Ark. Code Ann. § 4-9-320 (Repl. 2001); *Duke Wholesale, Inc. v. Pitchford*, 75 Ark. App. 223, 56 S.W.3d 399 (2001); *Merchs. & Planters Bank & Trust Co. v. Phoenix Housing Sys., Inc.*, 21 Ark. App. 153, 729 S.W.2d 433 (1987). FNBC further agrees that FMCC stands in Murphy's shoes, so that if Murphy was a buyer in the ordinary course of business, then FMCC also takes free of FNBC's security interest. *Duke*, *supra*. Arkansas Code Annotated section 4-1-201(9) (Supp. 2015) defines a "buyer in the ordinary course of business" as follows:

> "Buyer in ordinary course of business" means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. A person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of title under a preexisting contract for sale. Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under chapter 2 may be a buyer in ordinary course of business. "Buyer in ordinary

SLIP OPINION

course of business" does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

Based on this definition, the court in *Merchants*, *supra*, stated that there are five requirements for a buyer to qualify as a buyer in the ordinary course of business: (1) he must be a buyer in the ordinary course; (2) he must not take the goods in total or partial satisfaction of a preexisting debt; (3) he must have bought the goods from one who was in the business of selling goods of that kind; (4) he must buy in good faith and without knowledge that the purchase was in violation of another's security interest; and (5) the competing security interest must be one created by his seller. "Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Ark. Code Ann. § 4-1-201(20).

FNBC argued in its summary-judgment motion that Murphy was not a buyer in the ordinary course of business because he was the principal owner of Crossett Ford, he was personally obligated on the floor-plan loans, he left both vehicles on the lot after he had financed them with FMCC, and he could not title the vehicles in his name because he did not have possession of the COO or the certificate of title. FNBC thus alleged that Murphy did not buy the vehicles in good faith and without knowledge that the purchase was in violation of its security interest.

As FMCC asserts, however, whether a party has acted in good faith in a commercial transaction is generally a question of fact. *Midway Auto Sales, Inc. v. Clarkson*, 71 Ark. App. 316, 29 S.W.3d 788 (2000). The mere fact that Murphy was the principal owner of Crossett Ford does not automatically mean that his purchase of the vehicles was not in good faith or

in the ordinary course of business. *Merchants*, *supra*; *Crystal State Bank v. Columbia Heights State Bank*, 203 N.W.2d 389 (Minn. 1973). We held in *Merchants* that the buyer, who was the chief executive officer of the modular-home manufacturer, was not a buyer in the ordinary course under the facts in that case because he was personally liable on the note with the bank, he admitted that his unusually large down payment on the unit was an attempt to infuse capital into the business, and he also admitted that he knew the bank would receive none of the down payment. *Merchants*, 21 Ark. App. at 159, 729 S.W.2d at 436.

Here, while Murphy was obviously aware of FNBC's inventory lien due to his position with Crossett Ford, there is no evidence that the price he paid for either the F-150 or the Expedition was out of the ordinary or that he intended to defeat FNBC's security interest by his purchases. Murphy stated in his affidavit that his purchases from the dealership were the same as any other retail customer. He explained that he purchased the F-150 as a "shop truck" and that he purchased the Expedition for his wife. Although Murphy did not have possession of the COO or the certificate of title for the vehicles and did not title them in his name, we have held that such documents are merely evidence of title, not title itself; thus, the failure to obtain a new certificate of title does not affect a transfer between parties. *Commercial Credit Corp. v. Assocs. Discount Corp.*, 246 Ark. 118, 436 S.W.2d 809 (1969). *See also Midway Auto Sales, Inc.*, *supra* (holding that the failure of a buyer to obtain a certificate of title from the seller or to register the vehicle does not necessarily prevent the buyer from obtaining bona-fide purchaser status).

FNBC also seems to argue that FMCC could not be a buyer in the ordinary course of

business because it obtained its security interest from Murphy, not Crossett Ford, and because Murphy was not engaged in the business of selling Ford vehicles as required under Ark. Code Ann. § 4-1-201(9). However, the retail installment contracts clearly reflect that the contracts were between Murphy as the buyer and Crossett Ford as the seller of the vehicles. Crossett Ford then assigned the contract to FMCC, with Murphy signing in his position as a principal/salesman on behalf of Crossett Ford. Thus, FNBC is incorrect that Murphy and/or FMCC would be prevented from qualifying as a buyer in the ordinary course of business for that reason.

Because material questions of fact remain as to whether Murphy acted in good faith and whether he and FMCC would qualify as buyers in the ordinary course under the circumstances in this case, we agree with FMCC that the circuit court erred in granting summary judgment to FNBC on this basis. Thus, we reverse the grant of summary judgment in favor of FNBC. That does not end our inquiry, however, as FMCC further argues that the circuit court erred in denying its countermotion for summary judgment.

Relying on Ark. Code Ann. § 4-9-315, which codifies former Uniform Commercial Code ("UCC") section 9-306, FMCC first argues that its lien on both vehicles takes priority over FNBC's inventory lien because the floor-plan agreements between Crossett Ford and FNBC authorized the sale of the vehicles free and clear of FNBC's security interest. Section 4-9-315(a) provides as follows:

> (a) Except as otherwise provided in this chapter and in § 4-2-403(2):
> (1) a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and

(2) a security interest attaches to any identifiable proceeds of collateral.

As FMCC contends, where the secured party has authorized the disposition free of its security interest, section 4-9-315 does not require that the buyer be a "buyer in the ordinary course" in order to come within its protection. *Gen. Motors Acceptance Corp. v. Frank Meador Leasing, Inc.*, 6 B.R. 910, 913 (W.D. Va. 1980) (quoting 4 Anderson 311 § 9-306:18 (2d ed. 1971)). "A sale under this section destroys the interest of the secured party not because of the meritorious character of the buyer but because the secured party has agreed that a buyer may acquire rights by resale." *Id.* Thus, it must be determined whether the terms of the floor-plan agreements between FNBC and Crossett Ford authorized the dealer to sell the vehicles covered under those agreements free and clear of FNBC's security interest.

The agreements at issue here provided that as collateral for the line-of-credit loans, Crossett Ford agreed to grant FNBC "a first security interest in all new, program, and used motor vehicles in its inventory, all proceeds therefrom, all replacements, increases, additions, and substitutions to such inventory and on all tools and equipment located at the Dealer's place of business, 301 E. 1st. Ave., Crossett, Arkansas[.]" The agreements stated that the exclusive purpose of the loans was "to enable the Dealer to purchase new, program, and used vehicles or to finance used trade-in vehicles" and that "[e]ach time the Dealer requests an advancement, the Dealer shall be required to execute a separate promissory note in favor of the Bank and deliver to the Bank the manufacturer's certificate of origin for all new, and program vehicles, and certificates of title for all used vehicles." The agreements further provided that "[e]ach time the Dealer sells a motor vehicle from inventory, the Dealer shall

14

pay to the Bank the full amount due on the promissory note which was advanced by the Bank at the time the Dealer purchased that vehicle, at which time the Bank will release the certificate of origin or title to the Dealer."

Murphy further stated in his affidavit that the floor-plan agreements and his course of dealing with FNBC authorized him to sell vehicles free and clear of FNBC's security agreement in the regular course of his business. He indicated that he was never required to obtain prior approval before selling any vehicle.

Based on this evidence, FMCC contends that Crossett Ford was both implicitly and explicitly authorized by FNBC to sell the F-150 and the Expedition and that FMCC was therefore entitled to summary judgment pursuant to Ark. Code Ann. § 4-9-315. FNBC responds by first arguing that section 4-9-315 does not apply to the facts of this case because it does not involve the "entrustment doctrine" and cites to *Commercial Credit Corp.*, *supra*, in support of its argument. However, that case discussed the applicability of Ark. Code Ann. § 4-2-403, which is often referred to as the "entrustment doctrine"; it did not involve the statute at issue here, section 4-9-315. FNBC also argues that, even if section 4-9-315 does apply to this case, its introductory sentence qualifies it by reference to section 4-2-403(2), which requires that the buyer purchase the goods in the ordinary course of business. There is no merit to this argument because the comments to section 4-9-315 make it clear that the reference to 4-2-403(2) is intended to add another exception to the general rule set forth in section 4-9-315 that a security interest survives disposition of the goods. As discussed above, there is no buyer-in-the-ordinary-course requirement under section 4-9-315 if the security



agreement authorizes the disposition free and clear of the security interest.

FNBC does not necessarily refute that Crossett Ford had general authorization to sell vehicles out of its inventory but instead argues that the sale of the specific vehicles in question was not authorized because Crossett Ford did not pay off the loans on the vehicles as the floor-plan agreements required. FNBC also asserts that the agreements specifically prohibited Crossett Ford from having any motor vehicles on the premises except those financed by FNBC.

Contrary to FMCC's argument that it is entitled to judgment as a matter of law pursuant to section 4-9-315, we conclude that material questions of fact also remain on the issue of whether Crossett Ford was authorized to sell the vehicles at issue in this case. The floor-plan agreements did not contain a general provision authorizing Crossett Ford to sell vehicles from its inventory free of FNBC's security interest; instead, the agreements specifically stated that each time the dealer sold a vehicle from inventory, it was required to pay FNBC the full amount that had been advanced for the vehicle, at which time FNBC would release the certificate of origin or title. In addition, although Murphy stated that he never had to seek approval from FNBC prior to selling a vehicle, he also stated in his affidavit that he was authorized to sell vehicles free and clear of FNBC's security interest "in the regular course of his business," an issue as to which we have already determined that there remain material issues of fact. Given the unique circumstances of the sale of the vehicles in this case, further factual development is needed as to whether the exception in section 4-9-315 applies here, and FMCC was not entitled to summary judgment on this basis.

SLIP OPINION

FMCC also argues with respect to the F-150 that its security interest takes priority over FNBC's floor-plan lien because the vehicle was no longer "inventory" when FMCC filed and perfected its direct lien on August 20, 2012. "Inventory" is defined as "goods, other than farm products, which . . . are held by a person for sale or lease or to be furnished under a contract of service." Ark. Code Ann. § 4-9-102(48)(B) (Repl. 2001). FMCC cites to Ark. Code Ann. § 4-9-324(a) (Repl 2001), which states that a perfected security interest in goods other than inventory or livestock has priority over a conflicting security interest in the same goods, if the purchase-money security interest is perfected at the time the debtor receives possession of the collateral or within twenty days thereafter.

FNBC argues, however, that the F-150 was not removed from its inventory because it was never paid by Crossett Ford for the vehicle, because it retained the COO for the vehicle, and because the vehicle remained on the premises of Crossett Ford in violation of the floor-plan agreements. Based on the unresolved questions discussed above, there are also questions remaining as to whether section 4-9-324(a) would apply to the facts in this case, and FMCC was not entitled to summary judgment as to the F-150 on this ground.

Finally, FMCC contends, as an alternative to its other arguments, that it was entitled to judgment as a matter of law on the basis that Murphy was a buyer in the ordinary course of business. While FMCC argues that its proof on this issue was unrebutted, we have previously concluded that material issues of fact remain regarding this issue. Thus, the circuit court did not err by denying FMCC summary judgment on this basis. Accordingly, we reverse and remand the circuit court's order granting summary judgment to FNBC, and we

17



affirm the denial of FMCC's countermotion for summary judgment.

Affirmed in part; reversed and remanded in part.

GLADWIN, C.J., and BROWN, J., agree.

*Nixon & Light*, by: *John B. Buzbee*, for appellant.

*Streetman, Meeks & Gibson, PLLC*, by: *Thomas S. Streetman*, for appellee.